May it please the Court, my name is Phil Noble. I'm with counsel on behalf of Dr. Ronald Slaughter. Dr. Slaughter had the misfortune of being friends with Mr. Debeauchamp, who committed securities fraud, of investing in Mr. Debeauchamp's business, of attending a Christmas party, and having a brief conversation with strangers who forced themselves on him at the Christmas party who turned out to be the Tumelsons. As a consequence, he now finds himself held liable for securities fraud and for breach of fiduciary duty. The district court erred in allowing either of those theories to go forward to the jury. Under the Washington Securities Act, the primary liability, there must be a statement there must be evidence of a statement that is untrue or an omission from the statement of a material fact necessary to make it true in connection with the sale of a security. Counsel, I understand why you are selectively choosing parts of the evidence for your party, but let's broaden the facts a little bit. Dr. Slaughter was paid to go to Barcelona. All his expenses were picked up, right? Number one. Number two, he was described at the Christmas party as being a director, and he waved his hand. This was no surprise to him. He had been an incorporator at New Horizon from 1996 to 1998, right? New Horizon became WFFM. Then there was a $10,000 check paid to him as a director. Said, right? A director on it. Aren't those facts somewhat relevant as to his position with respect of what he should have investigated as to WFFM if he was holding himself out as a director? Doesn't a member of the board of directors under Nevada law and under WSSA have the of the corporation, and when he makes statements saying, I'm sanguine about his prospects, isn't that a representation and the omission of statements which would help an investor realize that his investment should not be held? There's a lot of things in your question. First, he made no statement. He made no statement about WFNN or its whether or not Tummel should invest or not invest. He discussed the corporation with investors, right? No. No. You can look in the record in the briefing that's cited, and there is no statement, no representation made by Dr. Slaughter in connection with the sale or offer of a sale of a security. There is just some general conversation that the Tummelsons had with him. About what? About a variety of things. About going to Barcelona, how things were, and coming up all the way from Las Vegas, things such as that. There is no statement attributed to Dr. Slaughter. But with respect to the Barcelona issue and the meetings they attended and the check, that might have some relevance with respect to secondary liability. It certainly doesn't have anything to do with primary liability because it doesn't go to any statement or a false statement or misrepresentation made by Dr. Slaughter. But the Court ruled as a matter of law that Dr. Slaughter was not a director, regardless of what was on the check and regardless of what he did in Barcelona. He, the judge, instructed the jury that Dr. Slaughter was not a director. If you look at the transcript, the Executive Record 243, the judge expressly told the Plaintiff's Counsel he was precluded from arguing that Dr. Slaughter was a director. The Court rejected Tomlinson's counsel request that the instructions include a statement that Dr. Slaughter could be held responsible for holding a position similar to a director. And if you look at the jury instruction number 30, there is no reference to finding Dr. Slaughter liable either as a director or as holding a position similar to being a director for the jury to conclude that by going to Barcelona or receiving the check or anything like that created the impression that Dr. Slaughter was a director, they would have had to make it up and they would have to make up their own law and their own circumstances. At minimum, that would entitle Dr. Slaughter to a new trial. Kennedy. The jury wouldn't have to make up the conclusion that the Tomlinson's got the impression that Dr. Slaughter was a director. But he is liable only if he is a director. What their subjective impressions may or may not have been is not relevant. The question is, was he a director? Did he act as a director? Did he act as a control person? The judge ruled he wasn't a director, and there was no evidence that he was a control person. And the judge ruled that he was not a director at Executive Record 243. Yes. All right? If he wasn't a director, and the judge ruled he wasn't a director, and the jury was not given the opportunity to determine whether he was a director because there was no instruction on that one. What do you understand to be the basis for the district court's refusal to grant your motion for judgment notwithstanding the verdict or a new trial or whatever was at the end of the trial? I'm sorry? Well, okay. If you go to this instruction number 30. Yes. Based on what you just said, your argument, there really was no basis then under the court's instructions to find your client liable. That's absolutely correct. Okay. Now, but the district court, you advanced that argument before the district court after the verdicts. Yes. And the district court rejected that argument. Well, I was very clear. And he did so on the basis that mainly it was an omission, I believe, the failure to disclose that he was not a director. Well, what he said was he could be found, that there was evidence by which the jury could have found that he was a director or that he held a position similar to a director. Now, that is totally inconsistent with what the judge ruled earlier in the case by telling the jury that he wasn't a director. I mean, that's what's so inconsistent about the whole situation. The jury is told he's not a director, and then the judge turns around and says, well, they could have found that he was, regardless of the instructions given by the judge, then I would suggest there was manifest error there. Was there any suggestion that he was an employee? No. He was not an employee. Why did he get the $10,000? It was an honorarium for going to Barcelona and spending his time there. An honorarium for what? For spending his time there. Now, he didn't ask for it. The testimony was that he could have. He didn't give it back. But he didn't. He put it in his pocket. And what did he think he was being paid for? For going to Barcelona and spending his time there. And frankly, it's not ---- Did he take $10,000 to go to Barcelona, all expenses paid? None of the other investors? He was given the money. He didn't return it. Now, frankly, I think it's not relevant because it doesn't show that he was a director. There was nothing he did. He didn't think that he had any obligation to the corporation or the shareholders by taking $10,000, being identified as a director, and waving his hand when he was so identified? Well, look, he waved his hand to acknowledge his presence at the party. As a director, because that's what de Bichamp said. There was no testimony, Your Honor, in the record that anyone believed that he was acknowledging the fact that he was a director by raising his hand at the party. Well, that's not the ---- that's certainly not the finding of the district court. Well, the testimony, the testimony is that they all said that he was acknowledging his presence. No one indicated that they believed that he was acknowledging his fact that he was a director. And even if he wasn't making that acknowledgment, that does not create liability because he never acted as a director, and the judge ruled he wasn't a director. And it doesn't meet the two-part test under the MECI standard for whether he was a control person. He went to Barcelona. He participated in some meetings, but there is no evidence he exercised control or even acted as a director while he was there. The fact that the check erroneously stated that he was being paid as a director doesn't convert him into a director. The district court concluded that and ruled that he wasn't as a matter of law. So as a consequence of that, by finding by saying that the jury could have found that he was a director is totally inconsistent, and there is no evidentiary basis for finding that Dr. Slaughter, when he did go to Barcelona, indeed acted as a director. Only the evidence is that there were some meetings that involved some third parties, and he made a recommendation regarding a 10-for-1 stock split. No vote, no direction given by Dr. Slaughter or anything else either at the meetings in Barcelona or at any other time. Significantly, the Barcelona trip occurred after, after the Tumblesons made the bulk of their purchases. So even if he was acting as a director or a control person on the Barcelona trip, which he was not, there was no evidence that at the time the Tumblesons made their investment that he held any value. Kennedy. Kennedy. Tumblesons had a chance on 521-2000 to back out and get their money back, and these representations had been made prior to that time. Let's not forget that. Well, that is not a transaction that was covered by the State Securities Law because there was no actual sale of a security under the Birnbaum rule and under the State statute. There was no – it's not covered by the State Securities Act. Well, sure it is. It's part of the sale transaction. If you have a chance to get out of the sale by affirming it or getting a rescission and refund, one view of the evidence is the sale isn't complete until you affirm. Now, there was a completed transaction. The money was paid. That's what you argue. Well, it's a matter of law, Your Honor. Is there a case that says that? They admitted it. They admitted it in the section in our reply brief, in their own briefing, that said they had paid the money and that they had – were investors. They had completed the transaction. There was nothing left to do. The offer to rescind occurred much later than that. It was not part of the original transaction. It was a new transaction, a new proposal, and there was nothing that Dr. Slaughter did that influenced or had any connection with that proposal. Yes. You have exceeded your time, but we won't take it away from counsel for Mr. Chin. I appreciate that, Your Honor. Thank you. Phil Talmadge here representing Kelvin Chin. This is a case, as I think as counsel has already argued, that should not have gone to the jury, and when it did go to the jury, it went to the jury on improper instructions with an improper verdict form. It resulted in Mr. Chin being subjected to liability where liability did not exist. His case is a little bit different than that of Dr. Slaughter because we have State Securities Act violations, we have breach of fiduciary duty, and we have fraud, misrepresentation under common law principles, and then Federal Securities Act violations as well. Counsel, let me ask you this. Even — well, let me think of a good way to ask this. Are the damages assessed against your client the same dollar amount under each of the theories on which he was found liable? It appears so, Your Honor, and that's one of the problems. Well, let me ask my follow-up question then. Even if the jury's finding can't stand under the Washington State Securities Act, why wouldn't the verdict be sustainable on alternative grounds if those alternative grounds either are not challenged by you or are supported by the evidence and the instructions? Because I don't think under any of the theories, the damage award that was entered against Mr. Chin was sustainable. And that goes to this particular fact. Mr. Chin was involved as the CFO of this corporation, but he was really an employee. His duties were severely restricted by Mr. de Beauchamp. He was, in effect, a modeler. He modeled revenue for a startup company. I think we need to keep that in mind. This is a startup company, so we're not talking about a company with a book of business, with business transactions. It's something that's starting up. Necessarily, they're going to be talking about the future. And in his case, the only basis for liability under any of these theories are two alleged statements made in the course of a 10- to 20-minute presentation at a marketing meeting on October 27th. In response to your question, Your Honor, under any one of the theories, the Tumblesons had made investments in the amount of at least $215,000 before this marketing meeting ever took place. So under any of the theories, there's no basis for an award of damages against Mr. Chin for those investments that had already been made at the instigation of Mr. Lucero and Mr. de Beauchamp. Just as I discussed with your learned colleague, they had a chance to get their money back on March 21st, I mean, May 21st, 2000. They were given the opportunity by Lucero to either affirm or get a rescission. That opportunity presented itself after Mr. Chin had made those two statements at the marketing meeting. Isn't there evidence that the Tumblesons would not have affirmed their investment had this CFO, who was charged with knowledge of the financial statement of the company, not omitted from telling them what the true condition of the company was? Your Honor, I think not for this reason. The question boils down to whether there was an executory contract under the Helenius case for purposes of the Washington Securities Act. But I would submit to the Court the proposition that would the reliance be reasonable on the part of the Tumblesons as a basic element of the fraud claim, the negligent misrepresentation claim, certainly the Federal Securities and the State Securities Act claim. Was there reasonable reliance under these circumstances? Mr. Chin was fired by WFNN two weeks after the marketing meeting on October 27th. So the statements that were made, we're talking about statements that were made on October 27th, the reaffirmation took place in late May of 2000. We're talking seven months later when the Tumblesons knew that there were problems with the website of this startup.com company. Was it reasonable for them to rely on statements made seven months ago? And moreover, the evidence seems to be pretty profound in this case that the instigation of Mr. Lucero and Mr. Debeauchamp on the Tumblesons was far more significant, far more significant than anything having to do with Mr. Chin's. But on the WSSA, there's joint and several liability. Well, it is, but there. So long as there's a substantial cost. What you're saying is that there's no reasonable reliance and there's no reliance in fact because of the time lapse. Absolutely. And as a matter of law. As a matter of law under the Haberman principles. And I would submit to the court knowing that my time is short, that with respect to the Federal Securities Act claim, there is no evidence of any use of the U.S. mail, the internet, or any other instrumentality of interstate commerce. There is a very fundamental aspect of a Federal Securities Act claim that's missing in their proof. This was an issue that was confined to two statements made at a marketing meeting, an oral presentation, perhaps, and we don't know this from the record, with a PowerPoint presentation. But that doesn't rise to the dignity of using the U.S. mails or the internet. And certainly, with the higher burden of proof, clear, cogent, convincing evidence of fraud and negligent misrepresentation, no evidence that these statements that were predictions of what was hoped to be the case for this startup company would amount to fraudulent misrepresentation of an existing fact that would be a basis for these common law theories. The fact of the matter is in this case, if you look at the record of the background of Mr. Chin, what he did in this case, it's a startup company. He made predictive statements at a brief meeting that was the only time he ever encountered these individuals, and he was fired two weeks later. It's very difficult to get to anything resembling a case under any of these theories. In response to Judge Piazza's question, you look at the analysis of the district court on the motions post-trial, and it's very difficult for me to understand what Judge Robart was thinking in terms of why Mr. Chin was made the case. Well, it's a little bit, you know, with respect to Mr. Chin, he wasn't employed, correct? He wasn't employed. Why doesn't that a basis to hold him liable under the Washington State Securities Act? Because he wasn't an officer, director, or anybody in control. But the instructions in 30 said you may be fined a defendant liable for his claim if he was an employee of such a seller or buyer and materially aided in the transaction. I think that's too distant, Your Honor. CFO is not a basis. But why provide a basis for liability? Well, there's a difference between CFO in fact and CFO by title, because in fact Mr. Chin's How did the Tummelsons know that, you know, he had the title of CFO, he was presented as a CFO? He wasn't even introduced. I think he may have been introduced as the CFO at the meeting, but he was entitled to make a statement. And he didn't know at this marketing meeting that investors were necessarily going to be present. The only individual who was allegedly present Well, what was the purpose of the marketing meeting if it wasn't to attract investors? Well, it was, these meetings were often held to talk about their marketing plans for the company apparently. That's all based, the whole purpose of that is to get people to, you know, to have confidence in what's about to happen. A statement made, two isolated statements made at one 10 or 15 minute marketing meeting to a group of people that may or may not have been investors. And there's a dispute in the record about whether any of the Tummelsons, the only Tummelson that was there was Katie Taylor, under their theory of the evidence. That's a pretty distant set of circumstances for this statement. Reliance is a different question. Reliance is a different question. But it's a, this guy is, this guy is somebody who didn't even have check writing authority. Mr. Debochamp deprived him of that. At that marketing meeting, did the, did the, was it disclosed that he didn't have check writing authority? That he was just, you know, he was just there to help? No, it was not. And I, I concede that. But I think the point is. And after he was fired, did they go, did they go to the Tummelsons and say, well, he was fired because he just, you know, he misinterpreted the data and he just. Well, it was disclosed to the Tummelsons that he was the one, it was disclosed to them that he was the one that was seeking recovery from the company. There was a disclosure of his arbitration proceeding with the company. So did they, they knew he was, had been fired? Apparently they did because there was a disclosure of that lawsuit to them or that arbitration proceeding to them. Your time has expired. Thank you. Thank you. We'll hear from the other side. Good morning. Good morning. May it please the Court, my name is Stephen Vanderhoff. I represent Kelly Tummelson, Katie Taylor, Eleanor Tummelson, all of whom are here today, and the late Jim Tummelson. This is, to me, in thinking about the case, has always been a circumstance where this was the perfect scheme that covered all of the bases, that had multiple causes and multiple tools and multiple team members. This is truly a total mixed case. The Tummelsons never would have invested in WFNN if they hadn't had confidence in the founder and visionary who was Mr. Debauchamp, successful businessman by all accounts, at least before they learned it differently in the State investigation. And he's not before us today, though. That's correct. The reason I mention him is because it's obvious that he was a driver, one of the most primary and significant drivers. But the law under both the WSSA and under basic fraud and negligent misrepresentation principles do not require that only the primary cause or the cause, the most obvious cause, be found liable. And the point of the question is about Dr. Slaughter's involvement. What statements did he make on which your clients relied? He was at the Christmas party, introduced as a director. And I would ask the Court to look very carefully at the record surrounding his wave and surrounding his introduction as a director. Did he say anything at the Christmas party when he waved? No. He did not. Okay. But the fact that he omitted to say that he was not a director. I don't understand. I don't understand how that helps you. I'm looking at the instructions given to the jury at pages 434 and 435, where the judge says to the jury, the Court has previously determined that Mr. Noble's client, Dr. Slaughter, was not a director of WFNM. That's established as a matter of law. And then he goes on to say some other things about other kinds of claims and says the tension that exists is I need to communicate to you, I have already held as a matter of law that Dr. Slaughter was not a director. So why is whatever else the jury has done consistent with that instruction, which you have not appealed from? Well, it's – I'll tell you. As the trial attorney, I felt stilted because I felt there was plenty of evidence to show that he was held out as a director. That's – I'll set that aside, though, because I'm not the one that makes the determination as to whether or not that goes to the jury. The primary point is there are multiple theories of liability. Okay. What other – what other theories of liability are there that don't require him to be a director? He can be a substantial contributive factor in their investment. Okay. What did he say and do that substantially contributed to the decision to invest, to buy the security? He had an open dialogue with Kelly Tomlinson at the Christmas party for several minutes about the stock split, which was the preeminent corporate effort that had because the investors believed, based upon the representations of WFNN, that somehow that multiplied the value of their – of their investment. That can't be a cause of the Tomlinson's buying into the company because the Christmas party took place at a time when the Tomlinson's, I think, had by that time $240,000 of their 275 invested. That's correct. So, I mean, that – is this a relation-backed talk? No, it's not. Because, as you indicated in – in discussions with Mr. Noble, in fact, the sale was not completed when the money was paid. These were – That's your theory, that the sale – That's correct. They purchased subject to a condition subsequent, which is you can get all your money back unless you affirm it? Not necessarily. No, because the – I'm trying to help you. Well, I understand that, but I also don't want to – I don't – You don't want to misstate Washington law. I do not. Okay. This was an executory contract. This is a case like Davis and Ohashi. This is a case where representations were made about those shares after the money was tendered. There's – the record is replete with the Tomlinson's saying a number of times, where are our share certificates, where are our share certificates, where are our share certificates. They were told, you invest, you'll get share certificates. The property that they invested in was not delivered until May, and it was under the auspices of an affirmation or rescission decision in May by which WFNN was able to backfill a number of incomplete representations about the company. Under Washington law, were the owners, even though the certificates had not been delivered? They would have the ability to enforce the contract and to enforce the performance of WFNN. Okay. But that doesn't change the fact that it was an executory contract. That, in fact, these shares were dangled over their heads as part of this umbrella and pooling scheme. Let me just go back to where I started, which was what Dr. Slaughter said and did, and you referred to the conversation at the Christmas party. Were there any other events, were there any other statements that would have supported liability on a theory other than the theory that he was a director? On any other theory other than the theory? Right. Because the jury was instructed as a matter of law that he was not a director, and you have not appealed that. So he's not a director. Absolutely. So you have to have some other theory that would support liability for him. The Court found that despite the fact that he was not a director, he could be liable because he held himself out or was held out as a director. So there is this de facto director theory that was given to the jury, and properly  Is he instructed on that notion? They were. That he could be a de facto? Well, they were instructed that if he was held out or allowed himself to be held out as a director, he would be responsible. He would be liable. Which instruction was that? That was the fiduciary duty instruction. I don't remember that. It's probably 14 or 15. Fifteen? I have 15 here. Let me take a look. I'm sorry for not having it at the top of my ---- Yeah. It's actually 14. Fourteen. Last two sentences. A person who knowingly represents himself or is knowingly represented as a director or officer. Now, this is consistent with equitable theories in Nevada and in Washington, and it's consistent with a fiduciary in fact theory. But let me go to something that's even clearer. He was an employee. He was paid. So he's also secondarily liable as an employee. More importantly, he was a control person. And if you take a look at the Hines case ---- What are the facts that support, the evidentiary facts that support a finding that he was a control person? He was one of the primary investors. He was held out as being on the board of directors. He attended directors' meetings. Isn't it ---- I'm sorry? By that theory, the Tunnelsons would be control persons because they were major investors, too. So investment makes you a control person? No. Not alone. But if you take a look at ---- and let me, if I may, consult my notes to make sure that I have exactly the right case. A control person under Hines, which is 787P2nd, primary site for it, at 8, page 8. It's a Supreme Court, Washington Supreme Court case that talked about control persons and specifically didn't adopt the culpable person standard. It did say, though, under the facts of Hines, which were remarkably similar to the facts here, that that defendant was a control person and, therefore, subject to secondary liability under the WSSA. He was not only an investor, Your Honor, but he served on the initial board of directors, Horizon Capital, and there's plenty of evidence that whether he called himself or not, he was paid as a director in Barcelona. Counsel, you keep coming back to a thing which, as a matter of law, has been excluded from this case. It was held as a matter of law that he wasn't a director, and that hasn't been appealed. It's a given in our analysis. So to say he was a control person because he acted as a director, it's very uncomfortable. I understand the holding out piece is different than that, but the control person piece ---- Right. But I would respectfully submit that we were precluded from arguing as a matter of law that he was a director. We were not precluded. You could have appealed that, and you didn't. That's true. That's true. We could have. And you didn't. And we didn't think it was necessary because we had an alternate theory that the Court gave us that said he is liable if he holds himself out or knowingly allows himself to be held out as director, which is a correct statement of law. For purposes of the rest of my argument, I won't focus. I want to ascribe him directorship. We all know the facts of what he actually did that indicated he might have been, including a board of director paycheck. Can we get back to any question that Judge Graber asked about five minutes ago, which is, what statement did Dr. Slaughter make upon which Tummelson relied in making the investment? You've got a problem there. Tell me what those statements were. Sure. And where are they in the record? The statements are in the record surrounding the and in the testimony of Kelly Tummelson and Katie Taylor. The cites I have are excerpt of record 274 through 75, 296 through 97, 307 through 309, and supplemental excerpts of record 86 and 87, which discuss the Christmas party. What did he say at the Christmas party to Kelly that upon which he relied in either making further investments or in keeping the investments at the time that the certificates had not been yet delivered under your theory that the contract was set at the executory? Did he talk about sales? Did he talk about assets? Did he talk about customers? Did he talk about how the company was doing? Point to me what he said. He had an open dialogue where he talked about Barcelona, okay? There wasn't specific Barcelona. The Barcelona Stock Exchange, I'm looking for, which doesn't exist, but that there was some stock on the Barcelona Stock Exchange. He talked about Barcelona. That didn't have to do with the company. Pardon me? That didn't have to do with the financial statement of the company. The jury was entitled in the context of that testimony to decide that, in fact, they weren't talking about sightseeing in Barcelona or about the Stock Exchange. They were talking about the board of directors meeting in Barcelona. He also talked specifically about the stock split. He also talked specifically about Dr. Slaughter's role in the company. What was his – what did he say was his role in the company? That's as much as we have in the record, because that's as much as witnesses two years later could recollect. So if they testified, we talked about his role in the company, and that's all we know, the role could be anything from I was in charge to, hey, I'm just another investor like you, or I have no role in the company, or, gee, I wish I had a bigger role in the company. It could be anything. It could be, but there was no evidence of the former. There was plenty of – excuse me, of the latter. There was plenty of – getting it mixed up. There was plenty of evidence that there were multiple discussions with the Tumblesons and others, with Mr. Slaughter and a number of these other four control folks. What did he say about the stock split specifically according to the testimony in your favor? Testimony is not specific. The testimony says, I discussed the stock split. So it could have been the stock split is squirrely, or there might be a stock split, or it could be anything. Sure. The jury could find that. But how could they find – how could they find anything specific? How could they find a misrepresentation if we don't know really what was said?  Okay. What other statements did he make besides at the Christmas party? He started with the conversation at the Christmas party. What else did he say or do that was reasonably relied upon to induce investment? Well, Kelly stated that he had a – the conversation lasted a good amount of time, enough to really get to know him or, you know, know his involvement with the company, which is Supplemental Exhibit Record 27. Katie Taylor also had a brief conversation with Slaughter about Barcelona, and there was no evidence that when anybody talked about Barcelona, they were talking about anything other than the meetings, the WFNN meetings in Barcelona. There's not a stitch of evidence in the record that Barcelona meant anything else to anybody at that Christmas party or otherwise. She also told him how much she enjoyed meeting a board member. This is where we get into omissions, which are just as important, just as probative, and – and are equally apt to expose one to liability. If by making an omission, you are not – you're not taking the opportunity to set the record straight on one of the statements that was made, the misstatements that was made. He was told – he was introduced as a director. And what you're saying is that by omitting to say, I'm not a director, that omission gave the impression that he was ratifying and endorsing the company for purposes of investment. And even more importantly, Your Honor, as the Tumblesees testified, they had the oversight of a board member or somebody who was acting in an oversight role, a fellow investor who was not the founder, not the primary salesperson in Lucero, and not the CFO. Okay. Let me – let me go back to – let me – let me go back to my original question. You've talked about the Christmas party. Are there any other events, conversations, statements, or activities besides the Christmas party? There were a number of visits to the WFNN offices by Slaughter throughout this timeframe. With the Tumblesees? Well, no. He came to the WFNN offices. No. I'm asking about statements to them. That's why she saw him. Okay. She saw him there. That's right. And you'll see throughout the record, whenever she saw him, she talked about Barcelona and the stock split. That was what she associated Dr. Slaughter with, was that fundamental decision that affected their investment. They felt he fulfilled the role that everybody feels a director should. Or someone in that oversight role, a control person, should, which is oversight, as a fellow investor, of what the company was doing. There was plenty of circumstantial evidence that, by virtue of his participation in constant meetings over a week in Barcelona, that he knew what was going on with that company, and he also omitted to tell the Tumblesees that there was no functional website, there were no customers, there was no future. Were the Tumblesees at Barcelona? No. All right. Let's pay attention to what Judge Graber asked. Besides the conversations at the Christmas party, what other occasions were there where Slaughter made any representations, including staying quiet in front of the Tumblesees? I can only point to the visits where he came to the office repeatedly. What visits? The WFNN came to Seattle, ostensibly in his role as a control person, but he came to meet with Mr. de Beauchamp, and there were discussions with Katie or comments to Katie, where Katie, again, would indicate to him, thank you for being a director or words to that effect. So there were very few. And you're right. That's the representation piece of this case, but it's only one piece of this case. What you're saying is that there was a Tumblesee present when Beauchamp talked to Slaughter? When they were in the same office. Oh, in the same office. Yes. What did Slaughter say to Tumblesee or in the hearing of Tumblesee to Beauchamp? I don't have a quote for you, but there are – there is evidence that – and it's perfectly understandable that over the course of several years, quotations are no longer found in people's memories. But there was – there were a number of visits where, essentially, the same impression that had been given at the Christmas party and the same comments about Barcelona and a stock split were made. Now, again, I will – I am not here to say that the Tumblesees invested because – solely because of Dr. Slaughter's representations. They didn't. His omissions were huge. And when you take a look at the total mix of everything they heard, everything they heard from Dr. Slaughter was consistent with everything they heard from everybody else, including promotional materials that described Dr. Slaughter, that he wasn't involved in, but nevertheless, he perpetuated this phenomenon. Those were superseded by things that – that – where he wasn't listed, correct? I'm sorry? Those documents were superseded by other documents where he was not listed. Well, no. I think in July of 2000, after the executory contract had been completed, Mr. Lucero met with Kelly Tumbleson and said, hey, there's no more – or there had been – there had been a letter from the company that there is no more board of directors. They're just advisors. This was after delivery of the share certificates, after they had completed the umbrella  Now, before you run out of time, I have a question about the Chin side of the case as well. And I want to be sure that I understand the facts about the Tumblesons' awareness of the arbitration involving Chin's firing. What is the evidence that they knew of the arbitration wherein he was complaining that he had been fired from the company? Again, it wasn't until July of 2000 in speaking with Mr. Lucero that they knew who that employee was. And if you take a look at the supplements that were given as part of the affirmation and, you know, final step of share certificate delivery, the employee was not mentioned. And in the first supplement, the second supplement, it just said that litigation had been resolved. So they didn't know the identity of who the employee is. They certainly didn't know it was a CFO, and they didn't know it was Chin. They had no clue, other than that it was any employee out there who had brought a claim. And that's – I don't have the site and the record, but those supplements, I can certainly provide a, you know, supplemental overview of the excerpts of record that are important. Would you just clarify to me the basis for holding Chin liable under the Washington State security? Sure. He was an officer. Nevada law is clear. He was an employee. He was an officer-employee. He was an officer-employee and secondarily, and primarily because he was part of this crucial team of founder, promoter, ostensible director, and CFO. So he's both primarily and secondarily liable. Secondarily liable is an employee and an officer. I would ask the Court, please, to take a look again at Instruction 30, because it is an incomplete statement of the WSSA. Our proposed instruction was a complete statement which had the additional secondary liability provision. Well, the Instruction 30 does include he was a – you may find a defendant liable for this claim if he was an employee of such a seller or buyer and materially aided in the transaction. That's true. And Chin, I think, is perfectly covered by Instruction 30. I'm talking about this. It would have been better if it had been a little, you know, a little more complete. And it would have been better if it had been complete and said if somebody acts in which we included in ours, and it was stricken in the final. But it's a complete statement of law. So to the extent that Slaughter is arguing somehow that he was prejudiced by an incomplete Instruction 30, he wasn't. He benefited because, in fact, we were – we were prohibited from saying specifically to the jury. And you can find Slaughter liable, too, under the WSSA because he acted like a director. We had the right to do that. We didn't appeal it. All I'm saying is, to the extent there's harm, it's – to the extent that there's harm, it was harm done to the plaintiffs. It was an invited error by Dr. Slaughter to allow an instruction with an incomplete WSSA description to go to the jury. Kennedy. Is your theory against Chin based on WSSA failure to inform the investors of the true condition of the company, or that the statements that he made at the marketing meeting regarding the 3.5 million hits within 30 days, and all brokers are going to have to be using our service, affirmative misrepresentations of facts known to him to be false? It's both. He made affirmative representations, which alone would subject him to liability far more specific than Slaughter's. Aren't those forward-looking statements of opinion? And we've briefed this, but the level of specificity and the fact that the CFO was saying it alone make them more than opinions and projections and puffery. And the case law is clear that forward-thinking or forward-looking statements can still be misrepresentations of existing fact. And if you take a look at the detail of these misrepresentations and who was saying it and the discrepancy between the Tumbleson's ability to know different and Chin's ability to know different, then very clearly they were intended to be relied upon and they were material misrepresentations of existing fact. If you'll allow me to go, I've got a couple more things I want to clarify. Why don't we give you one more minute to wrap up? Talking about Chin, Mr. Talmadge said he was only a modeler. Well, he wasn't only a modeler. He negotiated with the website company while he was there. He was far more than just somebody who showed up and spun hypotheticals. In fact, he did it at a marketing meeting where he had met an investor. The record reflects that Katie was introduced to him as an investor. So, you know, he was more than a modeler. He was, in fact, somebody who supposedly, he stood by, again, omissions are nowhere near as clear as representations, but they subject individuals to the same kind of liability if they're wrong. He went along with the charade that he was somehow the former CFO of Cisco, for goodness sake. So Chin was much more than a modeler. Chin, that presentation, if you take a look at the record as to that presentation, he was engaged in significant and detailed misrepresentations about WFNN, and he knew better, and he admitted that he owed fiduciary duties and that he had no basis, because he hadn't reviewed any of the applicable records. He had no basis for making those misrepresentations. Thank you, counsel. Thank you. I think we're now to rebuttal, and you may divide it as you wish. Thank you. A couple of quick points in response to one of the questions raised when I was speaking earlier about what the district court had said in its order to deny our motions about what the Tummelsons had testified to. I think it's important to recognize that district court did not have the transcript available, so what the court actually said does not really bore out by what the testimony was, and I think we should be looking at the testimony. With respect to the statements, Your Honors were exactly right that there is no representation made, no statements quoted, cited by the Tummelsons that was made by Dr. Slaughter. There is no omission from any statement that he had made. Counsel's constant statement that there was an open dialogue at the Christmas party is window-dressing because there was no statement made by Dr. Slaughter regarding, in connection with the sale of any security, or even regarding WFNN. He did not say, and there is no testimony in the record whereby he was quoted as saying he – talking about his role in the company. It was the Tummelsons who approached him and made all these comments. There was nothing made by – said by Dr. Slaughter, and there was no authority cited for the proposition that a person can be held liable under State securities laws simply by being in the room while someone else may have been making a misrepresentation or an omission, in this case, presumably to Beauchamp in connection with his welcoming comments at the party. There was no authority for the proposition that Dr. Slaughter can be held liable for statements made by Beauchamp. That's even assuming that Beauchamp made an improper statement or that Dr. Slaughter even knew that Beauchamp's statement was improper, again, for which there is no evidence in the record supporting either one of those propositions. Counsel talked about whether or not Dr. Slaughter was a – Roberts. 14, the last sentence of that instruction that counsel brought to my attention. That's the one that says a person who knowingly represents himself or is knowingly represented as a director only owes a duty until the person – fiduciary duty until the person or persons who believe he is a director or officer learn that he is not actually an officer or director. Yeah. That goes to the fiduciary duty issue, which we never – we have not talked about. That is the strangest instruction that I have ever heard. There is no legal proposition or authority or principle by which someone who is improperly introduced as a director suddenly – Did you challenge this instruction? Yes. And became – On that argument? Pardon? I don't remember that particular argument. You just advanced right now. Well, we argue that simply because he did not deny his introduction, that automatically endows him with fiduciary duties, either corporate fiduciary duties or specific fiduciary duties to the Tummelsons. Isn't he estopped from denying that he is a director because of the representation in which he participates and takes $10,000 as a director? Well, no, because he was not a director. Was that theory used at all? Pardon? Was the theory of estoppel to deny his directorship role used at all in the trial? The principle under the injury instruction was simply because someone else erroneously introduced him as a director, he became a fiduciary. There is no legal principle cited that makes it so. So the estoppel? Estoppel is an affirmative defense. It does not make him – he is estopped from denying the introduction. As a director. No. He has any – estopped from – at best, he's estopped from denying the introduction. But he does not make him a fiduciary, and certainly doesn't make him a fiduciary to the Tummelsons individually, which is what their argument is. At best, I mean, it sort of begs the question, who is he a fiduciary to? Everybody in the room who heard the introduction? Well, I understand this – I think this instruction seems to say that once he was presented as a director, they – the Tummelsons or whoever was there who heard that could view him and treat him as a director, and he could be treated as a director, even though he's not, as a matter of fact, a director. Yes. But even if he was – Until, it goes on to say, until the person who believes he is a director or officer learned that he is not actually an officer or director. Right. Well, they were told in May that he – that the only director was de Beauchamp through a mailing that they received, supplemental mailing, and it's in the briefing. But secondly – Was that before the affirmation or after? At the same time. At the same time. At the same time. But even if he was introduced and as a director, there is no basis by which – and even if the Tummelsons believed that he was a corporate director, and even assuming that he was a corporate director, that does not make him a fiduciary to the Tummelsons personally. Their argument is that he owed them personally. Rather than a corporation. Rather – as opposed to everybody else in the room. There is no testimony from them that they relied on him being a director by virtue of his raising his hand. There is no testimony from them that they were relying upon him to look after their interests or their welfare, which is what a fiduciary does. There is no testimony in the record that Dr. Slaughter accepted that role, undertook that role. There is no testimony in the record that the Tummelsons asked him for any advice or that he gave them any advice or that they expected him to give them any advice, which is exactly what a fiduciary does. Counsel, you have exceeded the rebuttal time, but we'll give counsel for Mr. Chin a minute as well. Thank you. Thank you. Just two very brief points in rebuttal, if I could, Your Honor. Judge, you asked a question of counsel about the basis for liability under the Washington State Securities Act. And counsel's response to you was the basis was twofold. One was the statements made at the marketing meeting, and second, the refusal or failure to correct any statements Mr. Debeauchamp made. That response indicates why there was a flaw in this case. The district court's minute order made it very clear that the only basis for liability against Mr. Chin was the statements made at the marketing meeting. And counsel has relied and has attempted to rely throughout this case on a theory apart from that. And that is a flaw in their argument and a basis as to why the district court here is not going to do it. I was quite clear it excepts the very good 126. I agree, Your Honor, completely. The second point is I think you heard counsel concede that, in fact, his client should have been aware that Mr. Chin was terminated, that there was a disclosure made that an employee was terminated, the disclosure was out there and well understood, that there was an arbitration proceeding taking place. He said they didn't know it was Mr. Chin. They knew in July of 2006, and I think they had an obligation given the fact that this was a small startup company with not a whole slew of employees, Your Honor. They'd already made the investment by that time. I think. But they also knew that, you know, Mr. Chin was not at the Christmas party. Mr. Chin disappeared from sight after the marketing meeting of October 27th. Thank you. Thank you. The case just argued is submitted, and we appreciate very interesting arguments by all counsel. Thank you. And we are adjourned. All rise. This court for the second hearing.
judges: Graber, Paez, Bea